# In the United States Court of Federal Claims

No. 14-458T

(Filed: May 30, 2017)

*************************************

|   |   |   |
|---|---|---|
| ******************** | ) | Corporate tax case; interest netting claim; |
| **FORD MOTOR COMPANY,** | ) | I.R.C. § 6621(d); jurisdiction over a claim |
|   | ) | for interest on an overpayment under |
| **Plaintiff,** | ) | I.R.C. § 6611; "same taxpayer" within the |
|   | ) | meaning of I.R.C. § 6621(d) |
| **v.** | ) |   |
|   | ) |   |
| **UNITED STATES,** | ) |   |
|   | ) |   |
| **Defendant.** | ) |   |
|   | ) |   |

*************************************

Robert E. Kolek, Schiff Hardin, LLP, Chicago, Illinois, for plaintiff.  With him on the briefs and at the hearing were Robert R. Pluth, Jr. and Ivan H. Golden, Schiff Hardin, LLP, Chicago, Illinois.

Jason Bergmann, Attorney, Tax Division, United States Department of Justice, Washington, D.C., for defendant.  With him on the briefs were David A. Hubbert, Acting Assistant Attorney General, Tax Division, and David I. Pincus, Chief, Court of Federal Claims Section, Tax Division, United States Department of Justice, Washington, D.C.

## OPINION AND ORDER

LETTOW, Judge.

Plaintiff, Ford Motor Company ("Ford"), brings suit to recover interest that the government, acting through the Internal Revenue Service ("IRS"), allegedly owes as a result of Ford's overpayment of taxes.  This is an interest netting case.  Ford seeks to balance the interest it owed and paid on underpayments of taxes with interest received from the IRS on overpayments.  Ford made an overpayment to the IRS for the taxes it owed in 1992, while Ford Export Services B.V. ("Export"), a former foreign sales corporation owned by Ford, made underpayments between 1990 and 1998.  Interest accrues on both underpayments and overpayments, but the interest rate imposed on taxpayers for underpayments is higher than the rate applied to the government for overpayments.  Under certain circumstances, however, a taxpayer may "net" accrued interest on equivalent underpayments and overpayments, thus negating the different interest rates.  The IRS denied Ford's attempts to net its overpayment from 1992 with Export's underpayments between 1990 and 1998 after determining that Ford and Export were not the "same taxpayer," as required by 26 U.S.C. ("I.R.C.") § 6621(d).  Ford

contends that it is the "same taxpayer" as Export and that interest netting should accordingly be permitted under I.R.C. § 6621(d).

Pending before the court are Ford's motion for summary judgment and the government's cross-motion for summary judgment pursuant to Rule 56 of the Rules of the Court of Federal Claims ("RCFC").  For the reasons stated, Ford's motion is denied and the government's cross-motion is granted.

## BACKGROUND

### A.  Interest Netting for Overpayment and Underpayment of Taxes

Generally, a taxpayer owes interest on tax underpayments, and the IRS owes interest on tax overpayments.  *See* I.R.C. § 6601(a) (providing for interest on underpayments owed to the government); I.R.C. § 6611(a) (providing for interest on overpayments owed to taxpayers).  Between 1939 and 1986, the interest rates for underpayments and overpayments were comparable or the same.  *See* United States Department of the Treasury, Office of Tax Policy, *Report to Congress on Netting of Interest on Tax Overpayments and Underpayments* (Apr. 1997), https://www.treasury.gov/resource-center/tax-policy/Documents/Report-Netting-Interest-1997.pdf ("Treasury Report"), at 7.  In 1986, Congress amended I.R.C. § 6621, which provides the applicable interest rates for underpayments and overpayments, through the Tax Reform Act of 1986, Pub. L. No. 99-514, § 1511(a), 100 Stat. 2085, 2744.  That Act established a higher interest rate for underpayments, setting the overpayment rate as the sum of the short-term Federal rate and two percentage points, and the underpayment rate as the sum of the short-term Federal rate and three percentage points.  *Id.*  Those rates have remained the same since 1986 as applied to most corporations, with certain exceptions for large corporate payments where the overpayment rate is decreased to half of one percent and the underpayment rate is increased to five percent.  *See* I.R.C. §§ 6621(a)(1)-(2), (c).

In 1996, Congress directed the Secretary of the Treasury Department to conduct a study and issue a report that addressed the "netting of interest on overpayments and underpayments." Taxpayer Bill of Rights 2, Pub. L. No. 104-168, § 1208, 110 Stat. 1452, 1473.  In its 1997 report, the Treasury Department explained that the IRS permitted "annual netting" of a taxpayer's equivalent underpayments and overpayments within a single tax year, which negates the interest rate differential to the extent the underpayments and overpayments match for that year.  Treasury Report at 1.  The IRS also permitted another form of netting for equivalent payments, referred to as "offsetting," when "taxpayers simultaneously have outstanding tax overpayments and underpayments for different years."  *Id.* at 1, 8-11; *see also* I.R.C. §§ 6402(a), 6601(f).  In 1997, the IRS also took the position that it did not allow "global netting," where either the overpayment or underpayment was already satisfied, and thus not outstanding, when the netting computation was performed.  *Id.* at 1, 13 (explaining that the IRS did not allow global netting when "the deficiency has already been fully paid by the taxpayer and/or the overpayment has already been fully refunded by the [g]overnment, so that one of the taxpayer's tax accounts has a balance of zero").

The Treasury Department responded by "recommend[ing] that Congress enact clear statutory authority for global interest netting," *id.* at 44, and Congress did so through the Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. No. 105-206, Title III, § 3301(a), 112 Stat. 685, 741 (codified at I.R.C. § 6621(d)).  The relevant provision states:

> To the extent that, for any period, interest is payable under subchapter A and allowable under subchapter B on equivalent underpayments and overpayments by the same taxpayer of tax imposed by this title, the net rate of interest under this section on such amounts shall be zero for such period.

I.R.C. § 6621(d).  In amending Section 6621, Congress explained:

> The Committee believes that taxpayers should be charged interest only on the amount they actually owe, taking into account overpayments and underpayments from all open years.  The Committee does not believe that the different interest rates provided for overpayments and underpayments were ever intended to result in the charging of the differential on periods of mutual indebtedness.

S. Rep. No. 105-174, at 61-62 (1998); H.R. Rep. No. 105-364, at 63-64 (1997).  Congress directed the Treasury Department to "implement the most comprehensive interest netting procedures that are consistent with sound administrative practice."  S. Rep. No. 105-174, at 62; *see also* H.R. Rep. No. 105-364, at 65.

### B.  Foreign Sales Corporations

In 1971, Congress "provided special tax treatment for export sales made by an American manufacturer through a subsidiary that qualified as a 'domestic international sales corporation' (DISC)."  *Boeing Co. v. United States*, 537 U.S. 437, 440 (2003) (footnote omitted).  That authority was largely replaced by provisions regarding foreign sales corporations ("FSC"), *id.* at 442, as set forth in the Deficit Reduction Act of 1984, Pub. L. No. 98-369, Title VIII, § 801(a), 98 Stat. 494, 985 (codified at I.R.C. §§ 921-27, *repealed by* the FSC Repeal and Extraterritorial Income Exclusion Act of 2000, Pub. L. No. 106-519, § 2, 114 Stat. 2423)).  A qualifying FSC presented tax advantages for its parent company within the United States because a portion of the FSC's export income was exempt from taxation.  *See* Staff of S. Comm. on Finance, Deficit Reduction Act of 1984, Explanation of Provisions Approved by the Committee on March 21, 1984, S. Print No. 98-169, Vol. I, at 636; *see also* I.R.C. §§ 921(a), 923 (specifying the particular portion of a FSC's foreign trade income that would be excluded from gross income).  The parent company of a FSC could use those tax benefits by selling its products to the FSC for resale in foreign markets, or by paying the FSC a commission for selling the parent's products in foreign markets.  *See* I.R.C. §§ 925(a), (b)(1); *Abbott Labs. v. United States*, 84 Fed. Cl. 96, 102 (2008) (detailing the FSC scheme), *aff'd*, 573 F.3d 1327 (Fed. Cir. 2009).  The remaining foreign trade income that was not exempt from taxation, when distributed to a parent company as a dividend, would generally not be subject to an additional tax on that distribution.  *See* I.R.C. § 245(c)(1)(A).  "The net effect of this scheme was to shift a prescribed amount of profit on export sales from an entity with a 35 percent effective tax rate to an entity (the FSC) with an effective tax rate of approximately 12 percent."  *Abbott Labs.*, 84 Fed. Cl. at 100 (citing Staff of Joint

Comm. on Taxation, 98th Congress, General Explanation of the Revenue Provisions of the
Deficit Reduction Act of 1984 (Comm. Print 1984), at 1045).

In light of the taxation precepts set forth by the World Trade Organization's General
Agreement on Tariffs and Trade ("GATT"), which permit "an exemption from tax of export
income . . . only if the economic processes [giving] rise to the income take place outside the
United States," the Senate Finance Committee provided that "a FSC must have a foreign
presence, it must have economic substance, and [its] activities that relate to the export income
must be performed by the FSC outside the U.S. customs territory." S. Print No. 98-169 at 636.
A foreign corporation seeking to qualify as a FSC would thus need to, among other
requirements, be created and organized under the laws of a foreign country or under the "laws
applicable to any possession of the United States," maintain an office and accounting records in a
foreign country, include at least one individual on the board of directors who is not a resident of
the United States, and make a formal election with the IRS to receive FSC treatment. I.R.C. §
922(a). FSCs were also required to be "managed outside the United States," holding board
meetings and maintaining a principal bank account in a foreign country, and conducting
"economic processes . . . outside the United States," such as soliciting and negotiating contracts
in a foreign country. I.R.C. §§ 924(b)(1), (c)-(d).

Congress repealed the FSC provisions through the FSC Repeal and Extraterritorial
Income Exclusion Act of 2000.

### C. Ford and Export

#### 1. Formation of Export as a FSC.

On December 28, 1984, Ford, a corporation organized and existing under Delaware law,
formed Export, "a Netherlands private company with limited liability." Stipulation of Facts
("Stip.") ¶¶ 1, 3, ECF No. 22.[1] Ford owned all of Export's common stock "[a]t all times." Stip.
¶ 4. It formed Export "with the intent that Export would qualify as a FSC" and that Ford would
benefit from the tax advantages provided to United States corporations engaging in certain
transactions with FSCs. Stip. ¶ 10. Export thus structured its management in accord with the
FSC requirements, and it elected to be treated as a FSC with the IRS. Stip. ¶¶ 9-10. Export
maintained its office and records, held a bank account "with a minimal cash balance," and held
board of directors and shareholder meetings in the Netherlands. Stip. ¶¶ 5, 11-12. Such
activities were conducted by ABN AMRO Trust Company (Nederland) B.V. ("ABN AMRO"), a
company hired by Ford for the purpose of managing Export. Stip. ¶¶ 5, 11-12. The Export
board of directors always included "personnel from ABN AMRO and at least one Ford
employee, one of whom was not a United States resident." Stip. ¶ 7. To remain qualified as a
FSC, Export also paid certain administrative expenses directly. Stip. ¶ 13.

---

[1]To enable the court to address their cross-motions for summary judgment on an
appropriate factual basis, the parties filed an extensive 66-paragraph joint stipulation of facts,
along with numerous exhibits.

Export "entered into a sale commission agency agreement" ("Commission Agency Agreement") with Ford and particular subsidiaries of Ford, where Export would "act as a commission agent FSC with respect to [Ford's and the subsidiaries'] export transactions after December 31, 1984." Stip. ¶ 16; *see also* Stip., Ex. 6 (Commission Agency Agreement (1985)), ECF No. 22-1. In accord with the FSC requirements, Export conducted particular activities outside of the United States with respect to the other companies' "qualifying export transactions." Stip. ¶ 17. Those activities included, among others, soliciting and negotiating contracts, advertising, processing customer orders, determining and transmitting final invoices, and assuming credit risk. Stip. ¶ 17. Export agreed to perform these activities to "ensure that Export's income would be treated as foreign trading gross receipts and would be subject to federal income tax at a favorable effective rate." Stip. ¶ 18. It received commissions for the transactions. Stip. ¶ 19.

In a separate agreement, Ford and its subsidiaries agreed to "participate in and perform" all of the activities that Export was responsible for under the Commission Agency Agreement in exchange for compensation. Stip. ¶¶ 22-24 (noting that such an arrangement was authorized by I.R.C. § 925(c) and 26 C.F.R. ("Treas. Reg.") § 1.924(d)-1(b)). The commissions and income received by Export were immediately paid to Ford as a dividend, with the exception of the finances necessary to satisfy Export's outstanding obligations. Stip. ¶¶ 21, 24. The transactions between Export and Ford never involved the physical transfer of money from or to Export's bank account. Stip. ¶ 27. Instead, they were only "reflected as entries on the books of account or accounting and tax records." Stip. ¶ 27. "Ford credited Export's books of account in the amount of the commissions and debited Export's books of account in the same amount (less any expenses or obligations that Export was legally obligated to pay directly) to reflect a dividend to Ford." Stip. ¶ 28 (explaining that such an arrangement was permitted by Treas. Reg. § 1.924(c)-1(d)(4)(ii)).

Export ceased its sales commission activities after the FSC provisions were repealed in 2000. Stip. ¶ 39.

   2.  *Ford's and Export's tax returns between 1990 and 1998.*

The relevant tax return filings by Ford and Export occurred between the taxable years of 1990 and 1998. *See* Am. Compl. ¶¶ 28-56, 66-69. Ford and Export each filed annual tax returns with separate taxpayer identification numbers. Stip. ¶ 34. Export underpaid its income taxes every year from 1990 to 1998, with the exception of 1994, while Ford overpaid its income taxes for 1992. Am. Compl. ¶ 66. Ford paid the underpayments owed by Export, plus interest accruing at the standard underpayment interest rate pursuant to I.R.C. §§ 6621(a)(2), (c), between 1999 and 2005,[2] and the government credited the overpayments due to Ford, plus interest accruing at the standard overpayment interest rate pursuant to I.R.C. § 6621(a)(1), on

---

[2]"Ford remitted payments of Export's tax liabilities to the [IRS] on Export's behalf." Stip. ¶ 36. Ford also "routinely prepared all of Export's federal tax returns and claims for refund." Stip. ¶ 33.

approximately June 2, 2008.  *See* Am. Compl. ¶¶ 2, 38-55, 67-68.  The IRS did not apply any interest netting under I.R.C. § 6621(d).  Am. Compl. ¶ 2.

### D.  Ford's Administrative Claims

In August 2008, Ford filed a claim for refund and request for abatement to recover $11,740,528 from the IRS.  Stip., Ex. 15 (Form 843, Claim for Refund and Request for Abatement (Aug. 28, 2008)), ECF No. 22-2.  Ford requested, among other things, that the "net interest rate of zero under [Subsection] 6621(d) be applied to the underpayments and overpayments" of Export and Ford as the same taxpayer.  *See id.* at FMC-SOF000187.  In support of its claim, Ford noted that Export had been liquidated into Ford on May 15, 2003.  *Id.*; *see also* Stip. ¶¶ 40-41 (stating that Export had elected to be treated as a disregarded entity and that all of its assets and liabilities were deemed to be transferred to Ford) (citing Treas. Reg. § 301.7701-3(g)(1)(iii)).  The IRS disallowed the claim on April 16, 2009, noting that Export and Ford had filed separate tax returns under different identification numbers and that Export's liquidation into Ford was "insufficient to satisfy the 'same taxpayer' requirement."  Stip., Ex. 16 (Letter from Jon Schwartz, Acting Field Director, IRS to Ford Motor Company (Apr. 15, 2009)) at 1-2, ECF No. 22-2.

Export was subsequently involved in a series of transactions in 2010, including three mergers and one sale: (1) Export merged into Ford Export Services Luxembourg, a Luxembourg entity; (2) that entity merged into 3000 Schaefer Road Company, a Michigan corporation; (3) Ford Export Services, Inc., a Delaware corporation, purchased "the assets and liabilities related to the business formerly conducted by [Export]" from 3000 Schaefer Road Company in exchange for stock; and (4) Ford Export Services, Inc. merged into Ford.  *See* Stip. ¶¶ 46, 47, 50, 52, 54, 55, 61; Am. Compl. ¶¶ 18-24.  On November 8, 2010, Ford filed a second claim for refund and request for abatement to recover $20,410,788 from the IRS.  Stip. ¶ 65; Compl., Ex. A at A-1.  Ford again requested that the IRS apply interest netting to its overpayments and Export's underpayments, and justified the request by referring to Export's merger into Ford through the transactions described above.  *See* Compl., Ex. A at A-2.  In December 2010, the IRS denied Ford's second claim.  Stip. ¶ 66.  The IRS determined that Export and Ford were still not the "same taxpayer" because the 2010 transactions "did not result in [Ford] being both liable . . . for the tax that [Export] underpaid and entitled to a credit or refund of the tax that [Export] overpaid," and thus "did not result in a merger" of Export and Ford.  Stip., Ex. 30 (Office of Chief Counsel, IRS, Mem. (Feb. 23, 2012)) at 2, ECF No. 22-2.

### E.  Ford's Present Suit

Ford filed suit on May 28, 2014, seeking to recover $20,410,788.  Compl. ¶ 2 *see also* Am. Compl. ¶ 2.  Ford alleges that this amount represents the additional interest for its 1992 overpayment that it would have received if the IRS had applied interest netting to Ford's overpayment and Export's underpayments pursuant to Subsection 6621(d).  *See* Am. Compl. ¶¶ 1-3, 61.  Ford specifically seeks to increase the interest rate by which the government credited Ford for its 1992 overpayment, such that the rate would equal the underpayment rate applied to the equivalent amount of Export's underpayments.  *See* Am. Compl. ¶ 61.  In support, Ford

alleges that "Ford and Export are the 'same taxpayer' for purposes of [Subsection] 6621(d) because, as a FSC, Export had no economic or operational substance and was a fiction created for tax purposes pursuant to the FSC regime of [Sections] 921-927." Am. Compl. ¶ 71.

On September 15, 2015, the court granted the parties' joint motion to stay the case pending resolution of an interlocutory appeal to the Federal Circuit in another case that addressed the "same taxpayer" provision under Subsection 6621(d) that is at issue here. Order of Sept. 15, 2015, ECF No. 25 (referring to *Wells Fargo & Co. v. United States*, 119 Fed. Cl. 27 (2014), *aff'd in part, rev'd in part, and remanded*, 827 F.3d 1026 (Fed. Cir. 2016)). The stay was lifted on July 28, 2016 after the Federal Circuit issued its decision in the *Wells Fargo* case. Order of July 28, 2016, ECF No. 26.

On January 12, 2017, Ford filed a motion for summary judgment pursuant to RCFC 56(a), asserting that Ford and Export should be considered the same taxpayer for purposes of Subsection 6621(d). Pl.'s Mem. of Law in Support of Pl.'s Mot. for Summary Judgment ("Pl.'s Mot."), ECF No. 35-1. The government filed a cross-motion for summary judgment, arguing that interest netting is not permitted because Ford and Export are not the same taxpayer. Def.'s Mem. in Support of Def.'s Cross-Mot. for Summary Judgment and in Resp. to Pl.'s Mot. for Partial Summary Judgment ("Def.'s Cross-Mot."), ECF No. 38. The competing motions were addressed at a hearing held on April 26, 2017.

## JURISDICTION

As plaintiff, Ford has the burden of establishing jurisdiction. *See Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988). Pursuant to the Tucker Act, the court has jurisdiction "to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act waives sovereign immunity and allows a plaintiff to sue the United States for money damages, *United States v. Mitchell*, 463 U.S. 206, 212 (1983), but it does not provide a plaintiff with any substantive rights, *United States v. Testan*, 424 U.S. 392, 398 (1976). "[A] plaintiff must identify a separate source of substantive law that creates the right to money damages." *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005) (en banc in relevant part) (citing *Mitchell*, 463 U.S. at 216; *Testan*, 424 U.S. at 398).

Ordinarily, the court considers tax cases under the jurisdictional predicates established by the Tucker Act and I.R.C. § 7422, which governs civil actions for tax refunds. *See Diversified Grp. Inc. v. United States*, 841 F.3d 975, 981 (Fed. Cir. 2016); *Foxx v. United States*, 130 Fed. Cl. 415, 418 (2017). This case, however, has a different jurisdictional basis. Here, Ford seeks to recover interest allegedly owed by the government due to Ford's tax overpayment, which claim for interest on an overpayment is not a tax refund claim, but rather is a money claim based upon I.R.C. § 6611. That statute, coupled with the Tucker Act, provides this court with jurisdiction. *See Alexander Proudfoot Co. v. United States*, 454 F.2d 1379, 1384 (Ct. Cl. 1972); *see also Cherbanaeff v. United States*, 77 Fed. Cl. 490, 500 (2007) (noting that the court has jurisdiction over claims for statutory interest when the taxpayer has already made an overpayment) (citing

*Brown & Williamson, Ltd. v. United States*, 688 F.2d 747, 752 (Ct. Cl. 1982)), *aff'd*, 300 Fed. Appx. 933 (Fed. Cir. 2008); *cf. Marsh & McLennan Cos. v. United States*, 302 F.3d 1369, 1372-73, 1375-81 (Fed. Cir. 2002) (construing and applying I.R.C. § 6611).  Ford also satisfied the statute of limitations by bringing its claim within six years after the claim first accrued, *see* 28 U.S.C. § 2501, because Ford filed suit on May 28, 2014, less than six years after the government credited the overpayments due to Ford in June 2008, *see Barnes v. United States*, 137 F. Supp. 716, 718 (Ct. Cl. 1956) ("[A] cause of action for interest does not accrue until the refund or credit is allowed.") (citation omitted).

Further, Ford's claims are not barred by the "substantial variance" rule, which prevents "a taxpayer from presenting claims in a tax refund suit that 'substantially vary' the legal theories and factual bases set forth in the tax refund claim presented to the IRS."  *Lockheed Martin Corp. v. United States*, 210 F.3d 1366, 1371 (Fed. Cir. 2000) (citing I.R.C. § 7422(a); Treas. Reg. § 301.6402-2(b)(1); *Cook v. United States*, 599 F.2d 400, 406 (Ct. Cl. 1979)).  That rule stems from the tax laws pertaining to tax refund claims, and thus only applies in the refund context.  *See id.*  Here, regardless of whether Ford's claims before this court vary from its claims presented to the IRS, the substantial variance rule does not apply because Ford is seeking interest on an overpayment pursuant to I.R.C. § 6611, rather than pursuing a tax refund claim.

## STANDARD FOR DECISION

Under RCFC 56(a), a grant of summary judgment is proper when the pleadings, affidavits, and evidentiary materials of the case demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-49 (1986).  A genuine dispute exists when the issue "may reasonably be resolved in favor of either party," *id.* at 250, and a fact is considered material when it "might affect the outcome of the suit under the governing law," *id.* at 248.  The moving party has the burden of establishing that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The court therefore draws all factual inferences "in the light most favorable to the party opposing the motion."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).  Summary judgment will be appropriate if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *Id.* at 587 (citation omitted).

## ANALYSIS

### A.  Subsection 6621(d)

The issue before the court is whether Ford and Export are the "same taxpayer" under Subsection 6621(d), such that interest netting would apply to Ford's overpayment and Export's underpayments.  Subsection 6621(d) permits global netting of "equivalent underpayments and overpayments by the same taxpayer," but "[t]he definition of 'same taxpayer' is not plain from the face of the statute."  *Wells Fargo*, 827 F.3d at 1035.  The term "same taxpayer" is not defined in the Internal Revenue Code, and it is not self-defining.  *Id.*

The Federal Circuit initially addressed the "same taxpayer" provision of Subsection 6621(d) in *Energy E. Corp. v. United States*, 645 F.3d 1358 (Fed. Cir. 2011).  In that case, Energy East underpaid its taxes while several other companies, unrelated to Energy East at the time, overpaid their taxes.  *Id.* at 1359-60.  Energy East subsequently acquired those companies and argued that interest netting should apply pursuant to Subsection 6621(d).  *Id.* at 1359-61.  The issue turned on "the point in time" at which the "same taxpayer" standard is applied.  *Id.* at 1361.  The Federal Circuit rejected Energy East's interest netting claim, holding that entities must be the same at the time the overpayments and underpayments were made.  *Id.* at 1361, 1363.

The Federal Circuit next examined the "same taxpayer" provision of Subsection 6621(d) in the context of three different merger situations.  *See generally Wells Fargo*, 827 F.3d 1026.  In situation one, two independent corporations each made a payment to the IRS, and subsequently merged.  *Id.* at 1029.  Interest netting was not permitted because the two corporations were not considered the same taxpayer at the time of the payments.  *Id.* at 1034-35 ("That the two entities later merged does not change the fact that they were separate at the time of the original payments.").  In situation two, a company made an overpayment, underwent four mergers in which it was the surviving corporation in each merger, and then made an underpayment.  *Id.* at 1029.  The government conceded that interest netting was allowed under that circumstance.  *Id.* at 1033.  In situation three, a corporation made an overpayment and later merged into a second corporation, with the second corporation surviving the merger.  *Id.* at 1029-1030.  That surviving corporation then made an underpayment.  *Id.* at 1030.  The Federal Circuit permitted interest netting, holding "that an acquired corporation that makes an overpayment before a merger is the 'same taxpayer' for the purposes of [Subsection] 6621(d) as the post-merger surviving entity that has absorbed the acquired corporation."  *Id.* at 1042.  In reaching that decision, the court of appeals relied upon the remedial nature of Subsection 6621(d) and principles of merger law.  *See id.* at 1036-39 (construing Subsection 6621(d) broadly because it was intended to remedy "an unintended consequence caused by unequal interest rates by ensuring that a taxpayer with equal underpayments and overpayments would owe no interest on those payments").

Those Federal Circuit decisions would generally provide a framework for analyzing the "same taxpayer" requirement under Subsection 6621(d), but they do not address the specific circumstances of this case.  The "same taxpayer" analysis occurs at the time of the overpayments and underpayments, *Energy E.*, 645 F.3d at 1361, 1363, but timing is not at issue here.  There is no dispute that Export was a valid FSC owned by Ford during the pertinent time period of Ford's overpayment and Export's underpayments.  *See generally* Stip.  Additionally, in light of the decision in *Wells Fargo*, Ford is not claiming that Export's 2003 liquidation or 2010 transactions rendered Export and Ford the same taxpayer for purposes of the 1990 to 1998 time period.  *See generally* Pl.'s Mot.  Ford instead takes a different approach, arguing that the court should disregard Export's corporate form.  *See id.* at 22-32.  The Federal Circuit has not addressed Subsection 6621(d) in the context of a FSC and its parent corporation, and Ford recognizes that its claim does not fall within the circumstances addressed in *Wells Fargo* and *Energy East*.  *See* Hr'g Tr. 22:25 to 23:25 (Apr. 26, 2017).[3]

---

[3]The date will be omitted from further citations to the transcript of the hearing held on April 26, 2017.

### B.  Ford and Export as Separate Entities

Ford specifically asserts that it was the same taxpayer as Export during the pertinent time period because Export was wholly owned by Ford and maintained no business purpose other than providing tax advantages to Ford pursuant to the FSC rules, thus making Export "an extension of Ford" for purposes of Subsection 6621(d).  Pl.'s Reply in Support of Pl.'s Mot. for Summary Judgment and Resp. to Def.'s Cross-Mot. for Summary Judgment ("Pl.'s Reply") at 1, 3, ECF No. 39.  The government responds that Ford "chose to establish Export as a separate taxpayer," and that Export's substantive business activities and purpose under the FSC provisions demonstrate that Export's separate corporate form should be respected.  *See* Def.'s Reply in Support of Cross-Mot. for Summary Judgment ("Def.'s Reply") at 2, ECF No. 40; Hr'g Tr. 63:15-18.  The government proposes two tests to guide the court's analysis, stating that two corporations should only be considered the same taxpayer if they (1) share the same taxpayer identification number or (2) have the same "relevant essentials."  Def.'s Mot. at 6.  The court need not accept or reject either of the government's proposed tests in deciding this case.[4]

### 1.  Applicable law.

In *Moline Props. v. Commissioner*, 319 U.S. 436 (1943), the Supreme Court stated precepts pertinent to separate corporate entities:

> The doctrine of corporate entity fills a useful purpose in business life.  Whether the purpose be to gain an advantage under the law of the state of incorporation or to avoid or to comply with the demands of creditors or to serve the creator's personal or undisclosed convenience, so long as that purpose is the equivalent of business activity or is followed by the carrying on of business by the corporation, the corporation remains a separate taxable entity.

*Id.* at 438-39 (footnotes and citations omitted).  Accordingly, "a corporation formed or operated for business purposes must share the tax burden despite substantial identity, in practical operation, with its owner."  *National Carbide Corp. v. Commissioner*, 336 U.S. 422, 429 (1949); *see also Ocean Drilling & Expl. Co. v. United States*, 988 F.2d 1135, 1144 (Fed. Cir. 1993) ("*Moline Properties* stands for the proposition that a parent corporation and its subsidiary corporation be accorded treatment as separate taxable entities.") (citing *Moline Props.*, 319 U.S. at 438-39; *National Carbide Corp.*, 336 U.S. 422); *Clougherty Packing Co. v. Commissioner, Revenue*, 811 F.2d 1297, 1302 (9th Cir. 1987) ("While *Moline Properties* concerned an attempt by the sole shareholder of a corporation to report on his personal return income attributable to the corporation, the rule it enunciates applies as well to a corporation and its subsidiaries.") (citing *National Carbide Corp.*, 336 U.S. 422).

---

[4] The Federal Circuit in *Wells Fargo* acknowledged the same two tests proposed by the government, but neither accepted nor rejected those tests in its decision.  *See generally Wells Fargo*, 827 F.3d 1026.

Nonetheless, the Supreme Court has acknowledged that separate corporate forms may be disregarded under certain circumstances, such as when an entity "is a sham or unreal" and thus becomes a "bald and mischievous fiction," *Moline Props.*, 319 U.S. at 439 (citing *Higgins v. Smith*, 308 U.S. 473, 477, 478 (1940); *Gregory v. Helvering*, 293 U.S. 465 (1935)), or when a "particular legislative purpose . . . call[s] for the disregarding of the separate entity," *id.* (citing *Munson S.S. Line v. Commissione*, 77 F.2d 849 (2d Cir. 1935)).[5]

Ford asserts that Export's separate corporate form should be disregarded because (1) Export, as a FSC, had no economic substance or business purpose apart from reducing Ford's tax liabilities, and (2) the legislative purpose underlying the FSC provisions and Subsection 6621(d) support such a finding. *See* Pl.'s Mot. at 22-27, 30-32; Pl.'s Reply at 3-14. Ford's contentions are unpersuasive for the reasons stated below.

2.  *Export maintained economic substance and a legitimate purpose as a FSC.*

To satisfy the FSC requirements, Export retained an office and records, maintained a principal bank account, held board of directors and shareholder meetings, and paid certain expenses directly. *See* I.R.C. §§ 922(a), 924(c); Stip. ¶¶ 5, 11-13. It also received commissions for engaging in substantive activity, such as negotiating contracts, advertising, processing customer orders, determining final invoices, and assuming credit risk. *See* I.R.C. § 924(d)(1); Stip. ¶¶ 17, 19.[6] Additionally, it formally elected to be treated as a FSC with the IRS and filed its own tax return. Stip. ¶¶ 9, 34. Export was therefore "by no means dormant or inert." *Harrison Prop. Mgmt. Co. v. United States*, 475 F.2d 623, 627 (Ct. Cl. 1973). Instead, its business activities demonstrate that it maintained substance and engaged in business functions. *See id.* at 626-27 (finding that a corporation performed business functions because it, among other activities, executed leases, paid taxes, maintained a checking account, held director and shareholder meetings, and "followed the formalities of corporate operation"); *see also Britt v. United States*, 431 F.2d 227, 237 (5th Cir. 1970) (stating that "minimal" business activity can be sufficient in recognizing a corporation as a separate entity).

_____

[5]Export was a foreign company, but United States tax law governs Ford's claim. *See* Treas. Reg. § 301.7701-1(a) ("Whether an organization is an entity separate from its owners for federal tax purposes is a matter of federal tax law and does not depend on whether the organization is recognized as an entity under local law."); *see also United States v. Goodyear Tire & Rubber Co.*, 493 U.S. 132, 145 (1989) ("[T]ax provisions should generally be read to incorporate domestic tax concepts absent a clear congressional expression that foreign concepts control.").

[6]Although Ford and its subsidiaries agreed to conduct Export's activities, *see* Stip. ¶¶ 22-24, Export was required to provide compensation in exchange for performance, *see* Treas. Reg. § 1.925(a)-1T(b)(2)(ii) ("If a related supplier is performing the required activities on behalf of the FSC with regard to a transaction, or group of transactions, the requirements of [Sub]section 925(c) will be met if the FSC pays the related supplier an amount equal to the direct and indirect expenses related to the required activities."). As the government notes, Export therefore "bore the economic costs and risk of performance of the foreign economic processes for the transactions it entered into." Def.'s Reply at 11.

Ford emphasizes that Export, as a FSC, was a "legal fiction" under the ownership and control of Ford, *see* Pl.'s Reply at 1, 3, but such an argument is misplaced. Control and ownership are not "of significance in determining taxability." *National Carbide Corp.*, 336 U.S. at 429, 433 (affording no significance to the fact that a corporation exercised control over its subsidiaries) (citations omitted); *see also Harrison Prop. Mgmt.*, 475 F.2d at 626 ("It is immaterial that . . . [a corporation's] policies and day-to-day activities are determined, not as decisions of the corporation, but by the owners acting individually.") (citing *National Carbide Corp.*, 336 U.S. at 433-34; *Carver v. United States*, 412 F.2d 233, 239 (Ct. Cl. 1969); *Tomlinson v. Miles*, 316 F.2d 710, 714 (5th Cir. 1963)). As the Court of Claims explained:

> That a corporation is regarded as a 'straw,' a 'dummy,' a 'phantom,' in itself proves nothing. The concept of the corporation is itself a fiction. . . . The decision to recognize or not to recognize the tax identity of a corporation depends upon what the corporation does, not what it is called, how many or how few own it, or how they regard it.

*Love v. United States*, 96 F. Supp. 919, 922 (Ct. Cl. 1951). Regardless of whether Ford considered Export a "fiction," Export engaged in substantive business activities in accord with the FSC requirements.

Ford also asserts that it was the same taxpayer as Export because it was effectively liable for Export's tax obligations. *See* Pl.'s Reply at 5-6. In support, Ford relies on two internal IRS memoranda prepared by IRS attorneys. *See* IRS Chief Counsel Adv. Mem. 200407015, 2004 WL 276550 (Feb. 13, 2004) ("I.R.C. § 6621(d) requires that the same taxpayer both be liable for the underpayment of tax, and entitled to the overpayment of tax."); IRS Field Serv. Adv. Mem. 200212028, 2002 WL 442928 (Mar. 22, 2002) (same). Although such memoranda may be informative of the IRS's position regarding interest netting, they are not precedential or binding, even within the IRS. *See Wells Fargo & Co. v. United States*, 117 Fed. Cl. 30, 41 & n.12 (2014) (citing *Rowan Cos. v. United States*, 452 U.S. 247, 262 n.17 (1981); *Magma Power Co. v. United States*, 101 Fed. Cl. 562, 571-72 (2011)). Further, the memoranda relied upon by Ford are unpersuasive because they conflict with more recent Federal Circuit precedent, which provides that the "same taxpayer" inquiry turns on "the *identity* of the corporation at the time of the payments." *See Wells Fargo*, 827 F.3d at 1035 (citing *Energy E.*, 645 F.3d at 1363) (emphasis added). In applying this identity-based analysis, the court of appeals in *Wells Fargo* did not allow interest netting in situation one because the two entities had not merged at the time of the respective payments, *id.* at 1034-35, despite the court's recognition that the surviving corporation after a merger "is automatically liable for the underpayments and entitled to the overpayments of its predecessors," *id.* at 1040-41; *see also Energy E.*, 645 F.3d at 1359, 1363 (rejecting Energy East's interest netting claim with particular acquired corporations, even though Energy East assumed all of the companies' liabilities after the acquisition). To qualify as a FSC and receive the tax advantages offered by Sections 921 to 927, Export was required to and did in fact establish itself as a foreign corporation with a separate and distinct identity from Ford.[7]

---

[7] Ford also argues that the IRS treated Export and Ford as the same taxpayer, stating that (1) the IRS "used overpayments in Ford's account to satisfy Export's liability," *see* Pl.'s Mot. at

Additionally, the fact that Ford formed Export to reduce its tax liability does not alter the analysis because those tax benefits were specifically authorized by Congress. Ford relies on precedents where a taxpayer used the corporate form to improperly avoid tax liability, rendering the entity a sham. *See, e.g., United States v. Scherping*, 187 F.3d 796, 801-02 (8th Cir. 1999) (applying an "alter ego" analysis and favoring substance over form to ultimately conclude that the entities at issue were "sham entities created on behalf of and used by taxpayers to evade payment of their federal income tax liabilities"). Ford's "substance over form" position is misplaced not only because Export maintained economic substance, but also because "[t]he substance over form doctrine applies to disregard the separate corporate entity where 'Congress has evinced an intent to the contrary.'" *Humana Inc. v. Commissioner*, 881 F.2d 247, 254 (6th Cir. 1989) (quoting *Clougherty*, 811 F.2d at 1302). Here, Export complied with the FSC rules expressly provided by Congress to lawfully receive tax benefits that would have been otherwise unavailable to Ford. *See Evans v. Commissioner*, 557 F.2d 1095, 1099 (5th Cir. 1977) (explaining that the formation of a corporation to obtain an interest rate that would not have otherwise been available to the individual forming the corporation "was a valid business purpose") (citing *Collins v. United States*, 386 F. Supp. 17, 20-21 (S.D. Ga. 1974), *aff'd*, 514 F.2d 1282 (5th Cir. 1975)). Because Export's conduct fell squarely within the scheme intended by Congress, Export's existence as a valid FSC is not analogous to a "sham" entity that is organized to impermissibly avoid tax obligations and undermine congressional intent. *See Moline Props.*, 319 U.S. at 439; *see also Gregory*, 293 U.S. at 470 (affirming the lower court's disregard of petitioner's reorganization because the transaction, although within the terms of the tax code, was "an elaborate and devious form of conveyance masquerading as a corporate reorganization" that fell "*outside the plain intent of the statute*") (emphasis added); *Strick Corp. v. United States*, 714 F.2d 1194, 1204-05 (3d Cir. 1983) (recognizing that a corporate form may

_____

26, Stip. ¶¶ 37-38, and (2) the IRS abated a penalty it had assessed against Export after Ford "explained that Export's tax underpayments were more than offset by Ford's tax overpayments," Pl.'s Reply at 6-7. Nonetheless, in these interactions with Ford and Export, the IRS did not concede any legal position or make any legal determinations that would now be binding. *See Dickman v. Commissioner*, 465 U.S. 330, 343 (1984) ("[T]he Commissioner may change an earlier interpretation of the law, even if such a change is made retroactive in effect.") (citations omitted); *Automobile Club of Mich. v. Commissioner*, 353 U.S. 180, 183 (1957) ("The doctrine of equitable estoppel is not a bar to the correction by the Commissioner of a mistake of law.") (footnote omitted).

Even if the court did afford weight to the events cited by Ford, those occurrences do not support Ford's position. First, as the government notes, the IRS is permitted to pay the liability of a taxpayer by crediting the overpayment of a different taxpayer. *See* Def.'s Cross-Mot. at 42-43 (citing Internal Revenue Manual § 20.2.5.13.1, Debit Interest on Liabilities Credited from Another Module by a Different Taxpayer (Apr. 27, 2016), https://www.irs.gov/irm/part20/irm_20-002-005r.html#d0e3564)). The transaction codes cited by the IRS also indicate that the transfers between Ford and Export were intended to correct payments placed in the wrong account, rather than to offset any interest. *See id.* at 43. Second, the issue regarding the IRS abatement turned not on whether Ford and Export were the same taxpayer, but rather whether "reasonable cause" existed for Export's failure to pay the full taxes owed. *See* Decl. of Tamara Lopez, Ex. A at 1, ECF No. 39-1.

be disregarded "*to avoid a fraud on the taxing statute*") (citing *Moline Props.*, 319 U.S. at 439) (emphasis added).

    3.   *The legislative purpose behind the FSC rules and Subsection 6621(d) do not support Ford's claim.*

    The purpose of the FSC scheme provides further support for the treatment of Export and Ford as separate entities.  Holding otherwise would undermine congressional intent, as the Sixth Circuit explained with respect to the DISC provisions that preceded the FSC rules.

> Congress intended that a Domestic International Sales Corporation should be treated as a separate entity and current "other earnings income" which was not "previous taxed income" or "accumulated income" should be taxed to the Domestic International Sales Corporation.  As the tax court noted, to hold otherwise would, in effect, be calling a Domestic International Sales Corporation a sham corporation and undermine the purpose of Congress in creating an exception to the tax laws through the Domestic International Sales Corporation legislation to encourage international trade by companies such as Addison Products so as to produce a balance between imports and exports. . . .  Congress has evidenced its clear intent that a Domestic International Sales Corporation be organized as a separate corporate entity for the express purpose of permitting tax deferral benefits.

*Addison Int'l, Inc. v. Commissioner*, 887 F.2d 660, 665-66 (6th Cir. 1989).

    Ford responds by relying on *Munson*, 77 F.2d 849, where the Second Circuit interpreted the term "owner" under the Merchant Marine Act of 1920 as including both the parent company and its subsidiaries.  *Id.* at 850-51.  That conclusion, however, was based upon the statute's specific purpose to promote an "American merchant marine" and to encourage investments by protecting investors from losses.  *See id.* (citing *Flink v. Paladini*, 279 U.S. 59, 62-63 (1929)).  Here, in contrast, the Senate Finance Committee considered the international restrictions set forth by GATT and accordingly specified that a FSC must be a foreign corporation with a "foreign presence" and "economic substance."  S. Print No. 98-169 at 636.  Ford and Export filed separate tax returns with different taxpayer identification numbers, *see* Stip. ¶ 34, because foreign corporations such as Export could not be included in a consolidated tax return, *see* I.R.C. § 1501 (permitting an affiliated group of a corporation to file a consolidated return); I.R.C. §§ 1504(a)(1), (b)(3) (explaining that an affiliated group encompasses "includible corporations," but not foreign corporations).  Congress did not include a provision that would allow FSCs to be encompassed within a domestic corporation's consolidated return.  *See Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) ("We assume that Congress is aware of existing law when it passes legislation.") (citing *Cannon v. University of Chicago*, 441 U.S. 677, 696-97 (1979)).  The FSC rules were thus based upon a FSC's formation as a substantive foreign corporation, with a separate identity from any parent corporation within the United States.[8]

_____

    [8]Ford also cites *Commissioner v. Bollinger*, 485 U.S. 340 (1988), where the Supreme Court addressed whether a corporation that "held record title to real property as agent for the

The remedial nature of Subsection 6621(d) is also unavailing under the circumstances presented in this case because Ford's claim falls outside the scope of the remedy contemplated by Congress. After receiving tax benefits on the basis that Export was a separate entity under the FSC rules, Ford is now attempting to gain further tax benefits by taking the opposite position and arguing that Export is the same taxpayer as Ford under Subsection 6621(d). *See* Pl.'s Reply at 14-19. Such an attempt extends beyond the remedy provided in Subsection 6621(d), which only ensures that the *same taxpayer* is not obligated to pay interest on equivalent underpayments and overpayments. *See Wells Fargo*, 827 F.3d at 1036-38 (examining the legislative history and purpose underlying Subsection 6621(d)). The global interest netting provision in Subsection 6621(d) thus addressed the limitations in the IRS's annual netting and offsetting policies, as discussed *supra*, at 2-3. It was not intended, on the other hand, to allow two separate entities, such as Ford and Export, to benefit from separate incorporation under one set of rules, and then later benefit from Subsection 6621(d) under the opposite premise. *See Commissioner v. National Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 149 (1974) ("[W]hile a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not.") (citing *Higgins*, 308 U.S. at 477; *Gregory*, 293 U.S. at 469; *Old Mission Portland Cement Co. v. Helvering*, 293 U.S. 289, 293 (1934)); *Harrison Prop. Mgmt.*, 475 F.2d at 626 ("Where individuals adopt the corporate form for purposes of their own, the choice of the advantages of incorporation to do business requires 'the acceptance of the tax disadvantages.'") (quoting *Moline Props.*, 319 U.S. at 439).[9]

---

corporation's shareholders was not the owner of the property for purposes of federal income taxation." *Id.* at 341. The Supreme Court acknowledged that a corporation is generally a separate taxable entity, but found that an exception existed under the facts presented because the corporation had functioned and held itself out as an agent. *Id.* at 345-51. The holding in *Bollinger* does not govern Ford's claim, however, because that decision was specifically premised on agency principles; Ford has acknowledged that the circumstances here are different. *See* Hr'g Tr. 24:19-22; *see also Moncrief v. United States*, 730 F.2d 276, 280 (5th Cir. 1984) (explaining that there are two distinct theories for not treating a corporation as a separate tax entity: (1) disregarding the corporate form, and (2) regarding the corporation as a nominee or agent). Ford instead relies on *Bollinger* as an exception to the separate corporate entity principle set forth in *Moline Properties*. Hr'g Tr. 24:19-22. Although exceptions exist, as the court discussed *supra*, those exceptions are not applicable in this case.

[9]Ford points to examples in the tax law where an entity or transaction is treated differently depending upon the circumstance or situation, such as when single-member limited liability companies may be recognized as separate entities for certain tax purposes but not others. Pl.'s Reply at 18. Ford's reliance is unpersuasive because in each example cited by Ford, there are specific Treasury regulations establishing an exception to the general principle that an entity is treated consistently for tax purposes. *See* Hr'g Tr. 16:23 to 17:7; Def.'s Reply at 17; *see also* Pl.'s Reply at 18 (citing the specific regulations that permit inconsistent treatment of single-member limited liability companies, subchapter S corporations, and intentionally defective grantor trusts). No regulation or statute exists here that would justify Ford's attempt to benefit from inconsistent tax treatment of Export.

In sum, Ford and Export are separate entities that should be treated accordingly.  Ford is therefore not entitled to net its overpayment interest with Export's underpayment interest because Ford and Export are not the same taxpayer under Subsection 6621(d).

## CONCLUSION

For the reasons stated, Ford's motion for summary judgment is DENIED and the government's cross-motion for summary judgment is GRANTED.  The clerk shall enter judgment in accord with this disposition.

No costs.

It is so **ORDERED.**


s/ Charles F. Lettow
Charles F. Lettow
Judge